UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **PUEBLO OF ACOMA**<br>25 Pinsbaari Drive<br>Acoma Pueblo, NM  87034<br><br>    PLAINTIFF,<br><br>    v.<br><br>**NORRIS COCHRAN**, in his official capacity<br>as Acting Secretary,<br>U.S. Department of Health & Human Services<br>200 Independence Avenue, S.W.<br>Washington, D.C. 20201<br><br>**DEPARTMENT OF HEALTH AND**<br>**HUMAN SERVICES**<br>200 Independence Avenue, S.W.<br>Washington, D.C. 20201<br><br>**ELIZABETH FOWLER**, in her official capacity<br>as Acting Director,<br>Indian Health Service<br>5006 Fisher's Lane<br>Rockville, MD 20857<br><br>**INDIAN HEALTH SERVICE**<br>5006 Fisher's Lane<br>Rockville, MD 20857<br><br>    DEFENDANTS. | Civil Action No. 21-_____<br><br><br><br><br><br>**COMPLAINT** |

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Plaintiff Acoma Pueblo ("Tribe"), a federally recognized tribe, for its causes of actions against the Defendants named above, alleges as follows:

### INTRODUCTION

1. The Tribe brings this action against the Department of Health and Human Services

("HHS") and its agency, the Indian Health Service ("IHS"), seeking redress for their decision to close the Acoma- Cañoncito -Laguna Hospital ("ACL Hospital") without providing Congress the requisite evaluation and one year notice required by Section 301(b) of the Indian Health Care Improvement Act ("IHCIA"), 25 U.S.C. §1631(b) and determination required by Section 105(i) of the Indian Self-Determination and Education Assistance Act ("ISDEAA"), 25 U.S.C. § 5324(i).  According to the IHS, it intends to cease operating ACL Hospital as a hospital on February 1, 2021 and instead begin operating the facility as an urgent care facility with limited hours and no capacity to provide inpatient or emergency room services.  The IHS's action comes at the height of the coronavirus pandemic that has killed over 421,000 Americans.  Ctrs. for Disease Control & Prevention, *COVID Data Tracker* (last updated Jan. 26, 2021, 12:16 P.M.), https://covid.cdc.gov/covid-data-tracker/#cases_casesper100klast7days.  Other hospitals in the area are already at full capacity and may not be able to treat the Tribe's members in a timely manner if the ACL Hospital is closed.  Nancy Laflin, *As COVID-19 cases decline, NM hospitals still remain full*, KOAT NEWS (Jan. 20, 2021), https://www.koat.com/article/even-with-covid-19-decline-nm-hospitals-still-remain-full-coronavirus-new-mexico-vaccine/35258921.

### JURISDICTION AND VENUE

2. This Court has jurisdiction over the subject matter of this action under 28 U.S.C. §§ 1331, 1361 and 1362 and 25 U.S.C. §§ 5324(i) and 5331.  This is a civil action brought by an Indian tribe that arises under the Constitution, federal common law and federal statutes, including the Administrative Procedure Act ("APA").

3. This Court has jurisdiction to adjudicate claims under 5 U.S.C. §§ 701-706 and 25 U.S.C. §§ 5324(i) and 5331.  The Tribe is suffering legal wrong and is adversely affected or aggrieved by Defendants' actions to close ACL Hospital prior to the one year notice and evaluation required by Congress and without ensuring that funding will not be limited for the

program and that services will continue to be provided to the Tribe.

4. This Court has jurisdiction to adjudicate claims under 28 U.S.C. §§ 2201 and 2202. This is an action that seeks declaratory and injunctive relief.

5. Pursuant to 5 U.S.C. § 702, the United States has waived its sovereign immunity from this lawsuit, including claims against its agencies and officials.

6. Venue is proper in this Court under 28 U.S.C. §§ 1391(b)(2) and (e)(1) because this is an action in which the Defendants are officers and employees of the United States acting in their official capacities, and a substantial part of the events or omissions giving rise to this claim occurred in this judicial district.

**PARTIES**

7. Plaintiff, the Acoma Pueblo is a federally recognized Indian Tribe that is served by the ACL Service Unit of the Indian Health Service.

8. Defendant Norris Cochran, the Acting Secretary of Health and Human Services ("Secretary"), has overall responsibility for carrying out all the functions, responsibilities, authorities and duties of the U.S. Department of Health and Human Services, including oversight of the IHS, an agency within the Department. He is sued in his official capacity.

9. Defendant Department of Health and Human Services is an agency in the Executive Branch of the federal government, and it oversees the IHS.

10. Defendant Elizabeth Fowler is the Acting Director of the IHS. She is sued in her official capacity.

11. The IHS is an agency of the Department of Health and Human Services and is responsible for providing federal health care services to American Indians and Alaska Natives. The IHS operates the ACL Service Unit.

**FACTUAL ALLEGATIONS**

12. ACL Hospital, which is part of the Acoma-Cañoncito-Laguna Service Unit of the IHS, opened in the 1970's and has been the primary provider of health care services to the Pueblo of Acoma, a federally recognized Indian tribe, as well as the Pueblo of Laguna, ever since. *See* IHS Contractor, *ACL Hospital*, http://www.ihscontractor.com/acl-hospital.html#/ (last visited Jan. 27, 2021). The facility is notable for special features intended to support Native cultural and ceremonial practices and is, itself, very much woven into the culture of the life of the pueblos it has served for so long. *Id.*

13. On December 31, 2019, the Wuhan Municipal Health Commission, China, reported "a cluster of cases of pneumonia in Wuhan, Hubei Province." World Health Org., *Archived: WHO Timeline – COVID-19* (Apr. 27, 2020), https://www.who.int/news/item/27-04-2020-who-timeline---covid-19. This was the first official report of the emergence of a new, highly contagious virus, which became known as COVID-19.

14. In late January or early February 2020, the first COVID-19 cases were identified in the United States. Ctrs. for Disease Control & Prevention, U.S. Dep't of Health & Human Servs., *Evidence for Limited Early Spread of COVID-19 Within the United States, January-February 2020*, 69 Mortality & Morbidity Weekly Report 680, 680 (June 5, 2020). On January 31, 2020, in response to growing concerns about COVID-19, President Trump declared a public health emergency under the Public Health Service Act. Nat'l Conference of State Legislatures, *President Trump Declares State of Emergency for COVID-19* (Mar. 25, 2020), https://www.ncsl.org/ncsl-in-dc/publications-and-resources/president-trump-declares-state-of-emergency-for-covid-19.aspx. Subsequently, on March 13, 2020, he issued two national emergency declarations under both the Stafford Act and the National Emergencies Act and invoked emergency powers via Executive Order under the Defense Production Act on March

18, 2020.  *Id.*; *see also* Proclamation No. 9994, 85 Fed. Reg. 15,337, 15,337-38 (Mar. 13, 2020); Exec. Order No. 13,909, 85 Fed. Reg. 16227 (2020).

15. Beginning in early spring 2020, the entire medical profession was mobilized to address the worst pandemic the United States had experienced since the Spanish Flu of 1918.  Dan Mangan & John Schoen, *Coronavirus cases: These states face biggest potential shortfalls in hospital ICU beds*, CNBC (Apr. 6, 2020), https://www.cnbc.com/2020/04/06/coronavirus-cases-states-with-biggest-hospital-bed-shortfalls.html.  Medical experts sounded the alarm that the pandemic would increase in severity in the fall and winter seasons and urged that every effort be made to expand hospital capacity, both for COVID-19 patients, as well as for patients with other conditions requiring hospitalization.  Olivia Goldhill, *'People are going to die': Hospitals in half of the states are facing a massive staffing shortage as COVID-19 surges*, STAT News (Nov. 19, 2020), https://www.statnews.com/2020/11/19/covid19-hospitals-in-half-the-states-facing-massive-staffing-shortage/.

16. In February 2020, the Albuquerque Area Indian Health Service (AAIHS) office received a letter of intent to contract from the Laguna Health Corporation (LHC), which proposed to withdraw the Pueblo of Laguna's funding shares from the ACL hospital in accordance with Title I of the Indian Self-Determination and Education Assistance Act (ISDEAA) for the purpose of establishing a day-time clinic at Laguna, approximately 15 miles from the hospital.  Ex. A., 4,5.  This letter of intent was followed by a Title I contract proposal on July 1, 2020.  Ex. A.  Six weeks later, on August 11, 2020, the AAIHS held its initial consultation meeting with the Pueblo of Acoma to inform them of its intent to enter into the contract and that, as a result, the IHS would be dramatically reducing services at the ACL hospital.  Ex. A, 2.

17. In September 2020, following up on the August 11th meeting, the AAIHS provided the Pueblo of Acoma with a one-page proposal which outlined major reductions in service and

involved closing the ACL hospital and replacing it with an urgent care facility with limited operating hours. Ex. A, 1. The proposal stated that the ACL hospital had 135 full time employees (including 7 Public Health Service Commissioned Officers) and 64 vacancies. Ex. B. The document indicated that the removal of Laguna's share would require a reduction in staff of 76. Ex. B. The document stated the IHS's intent to replace the 24-hour hospital with primary care and urgent care that would be provided Monday through Friday, from 8 a.m. to 4:30 p.m., with no week-end hours. Ex. B. In addition to the reduction in hours, it expressly stated the IHS would discontinue the following services:

- Emergency Room
- Inpatient Services
- Women's Services
- Optometry
- Podiatry
- Pediatrics

Ex. B. In addition, the pharmacy would no longer be able to provide over-the-counter drugs, nor would it be able to support Pueblo of Acoma and Pueblo of Laguna EMS with medications. Ex. B. Additionally, the facility would no longer provide anticoagulation and Hepatitis C treatment, and there would be no outside prescriptions and no curbside services. Ex. B. The dental program would no longer be able to provide dentures. Ex. B.

18. The proposal was not accompanied by the evaluation and one year notice required by Section 301(b) of the IHCIA or the determination required by Section 105(i) of the ISDEAA. Instead, in response to a question by Senators Heinrich and Udall and Representative Small about how the IHS intended to comply with its requirements under Section 301(b), the IHS attempted to explain its position as follows:

> The IHS has *not* indicated that it believes the 1-year notification to Congress described by Section 301(b) of the Indian Health Care Improvement Act (25 U.S.C. § 163l (b)(l)) does not apply in this situation. As a result of the significant reduction of resources available to the Federal program, the IHS believes that it will be necessary to permanently transform or re-design the ACLSU Hospital and is preparing a closure report. The Secretary will submit a report to Congress as required by section 1631(b)(l). Additionally, in a letter to the Pueblo of Acoma dated September 17, 2020, the IHS stated that it is preparing a closure report for the Secretary to submit to Congress.
>
> In the meantime, the IHS is aware that 25 U.S.C. § 163l (b)(2) provides that the requirements of section 1631(b)(1) "shall not apply to any *temporary* closure of a facility or of any portion of a facility if such closure is necessary for medical, environmental, or safety reasons." *See* 25 U.S.C. § 1631(b)(2) (emphasis added). Because the LHC contracted for the Pueblo of Laguna's portion of programs and associated Tribal shares (funds) of the ACLSU Hospital, the resulting reduction of funding available to the Federal program may render the continued safe operation of inpatient and emergency departments at the ACLSU Hospital unfeasible. Thus, the IHS may be required to *temporarily suspend* services in the impacted departments during the 1-year notification period if the IHS cannot safely provide the services with the new funding level. Any such stoppages would be: 1) only temporary; and 2) necessary for medical, environmental, or safety reasons, until the permanent closure report requirement is met.

Ex. A, 3.

19. The IHS formally approved Laguna's proposed Title I contract on September 29, 2020. Ex. C. Laguna had initially proposed to receive its shares effective October 1, 2020, but it became evident in September that Laguna was not ready to open its facility so the final negotiated date for the withdrawal of the shares was set for February 1, 2021. Ex. D. In January 2021, Laguna informed the IHS that it needed an additional 30-days before it could open its clinic. Lewis Aff., Ex. E, ¶ 5.

20. On October 26, 2020, the Acting Director of the ACL hospital informed the Pueblo of Acoma that 13 medical professionals had resigned and a substantial additional number announced that they would be retiring or taking jobs elsewhere. Lewis Aff. Ex. E, ¶ 4. As a result, the IHS said the emergency room and urgent care would no longer be open 24 hours per day. Lewis Aff. Ex. E, ¶ 4. Instead, these facilities would be open 14 hours per day (eventually the emergency

room was closed) and no further patients would be admitted to inpatient services. Lewis Aff. Ex. E, ¶ 4. Months before the official date upon which the Laguna shares would be removed (February 1, 2021), the hospital downsized to a day-time only urgent care clinic. *See* Lewis Aff. Ex. E, ¶¶ 4-5.

21. The facility operated in this diminished capacity until January 1, 2021, when the IHS reestablished the emergency room and 24-hour operations. Lewis Aff. Ex. E, ¶ 5. However, the IHS only committed to maintaining the restored hours and services until January 31, 2021. Upon the withdrawal of Laguna's shares effective February 1, 2021, the IHS has said that the ACL hospital will again revert to a day-time only urgent care clinic. *See* Lewis Aff. Ex. E, ¶ 5.

22. The Laguna Pueblo has denied that it was ever asked by the IHS to delay taking its shares and further denied that it was advised that the removal of the shares would result in the closure of the 24-hour hospital, upon which Laguna tribal members also rely. Ex. F.

23. American Indians and Alaska Natives ("AI/AN"), including the Native communities served by the ACL hospital, suffer from diseases in much higher numbers than the U.S. population as a whole. Prior to the pandemic, AI/AN causes of death exceed the U.S. rate by:

- 5.5 times the rate for tuberculosis;
- 4.7 times the rate for chronic liver disease and cirrhosis;
- 3.1 times the rate for diabetes;
- 1.4 times the rate for pneumonia and influenza; and
- 1.0 times the rate for chronic lower respiratory diseases.

Indian Health Serv., U.S. Dep't of Health & Human Servs., *Trends in Indian Health* 50 (2014).

24. The IHS acknowledges the health disparities in Indian Country:

> The American Indian and Alaska Native people have long experienced lower health status when compared with other Americans. Lower life expectancy and the disproportionate disease burden exist perhaps because of inadequate education,

> disproportionate poverty, discrimination in the delivery of health services, and cultural differences. These are broad quality of life issues rooted in economic adversity and poor social conditions. . . . .
>
> . . . .
>
> American Indians and Alaska Natives born today have a life expectancy that is 5.5 years less than the U.S. all races population (73.0 years to 78.5 years, respectively). American Indians and Alaska Natives continue to die at higher rates than other Americans in many categories, including chronic liver disease and cirrhosis, diabetes mellitus, unintentional injuries, assault/homicide, intentional self harm/suicide, and chronic lower respiratory diseases.

Indian Health Serv., *Fact Sheets, Disparities*, https://www.ihs.gov/newsroom/factsheets/disparities (last updated Oct. 2019).

25. These health disparities have contributed to severe COVID-19 illness and death rates among the AI/AN population. Based on the most recent data, COVID-19 mortality among AI/ANs is significantly higher than that of other populations, particularly non-Hispanic Whites. Ctrs. for Disease Control & Prevention, U.S. Dep't of Health & Human Servs., *COVID-19 Mortality Among American Indian and Alaska Native Persons – 14 States, January—June 2020*, 69 Mortality & Morbidity Weekly Report 1853, 1853 (Dec. 11, 2020). For example, the cumulative incidence of laboratory-confirmed COVID-19 cases among AI/AN persons was 3.5 times that among White persons," and "[a]mong persons aged 20–29 years, 30–39 years, and 40–49 years, the COVID-19 mortality rates among AI/AN were 10.5, 11.6, and 8.2 times, respectively, those among White persons." *Id; See also Letter of Gov. MLG to Pres. Biden,* Exh., L.

26. It is inevitable that the closure of the ACL hospital during a pandemic would do irreparable harm to Acoma and the surrounding communities. Just from a mental health standpoint, the added strain of arranging for new doctors and travelling, typically at least one hour or more, in the middle of a pandemic takes a terrible toll on the Acoma community; however, there is also more specific harm. Shalini Ramachandran, *A Hidden Cost of Covid: Shrinking Mental-Health*

*Services*, Wall Street J. (Oct. 9, 2020), https://www.wsj.com/articles/a-hidden-cost-of-covid-shrinking-mental-health-services-11602255729.

27.     Tragically, the closure of the ACL hospital contributed to the death of an Acoma citizen who was not able to be reached by Acoma Emergency Medical Service (EMS) in a timely manner because it was addressing needs precipitated by the closure. Lewis Aff. Ex. E, ¶ 7. Indeed, because of the closure, the Acoma EMS department has become the primary care service for the Pueblo of Acoma and is stretched to its limit, not only responding to the usual needs of the community, but also responding to COVID-19 calls, and now calls that formerly would have been handled by the ACL hospital. Lewis Aff. Ex. E, ¶ 6. The Acoma EMS program is operated by the Tribe under a Title I contract with the IHS. The IHS provides some funding for the program, but the Tribe supplements that funding with its own funds. The Tribe had to significantly increase the funding it allocated to the EMS program after the temporary closure of the Hospital this fall. Lewis Aff. Ex. E, ¶ 8. Acoma EMS spends an extraordinary amount of time transporting patients to hospitals in Albuquerque, a two-hour roundtrip. Lewis Aff. Ex. E, ¶ 6. Because of this, it is almost impossible for Acoma EMS to provide adequate emergency care to the Acoma community. Lewis Aff. Ex. E, ¶ 6.

28.     On November 1, 2020, an Acoma member suffered a heart attack in his home on the reservation. Lewis Aff. Ex. E, ¶ 7. Because Acoma EMS services were transporting another patient, they were not immediately available to respond, requiring the Laguna EMS to be the first responder, even though they are located nearly 20 miles farther away. Lewis Aff. Ex. E, ¶ 7. The patient, who tested positive for COVID-19, passed away before he could be transported to a hospital. Lewis Aff. Ex. E, ¶ 7. Critical time was lost while Laguna scrambled its EMS to serve a patient at Acoma. Lewis Aff. Ex. E, ¶ 7. This death is directly traceable to the adverse impact on healthcare at Acoma as a result of the closure of the ACL hospital. Lewis Aff. Ex. E, ¶ 7.

29.     The *New York Times* reported on a patient who had to be taken to two separate hospitals before he could receive treatment for multiple fractures in both his legs because the ACL Hospital was closed.  Mark Walker, *Native Americans Reliant on Hospital Feel Abandoned by U.S. During Pandemic*, (Jan. 3, 2021), https://www.nytimes.com/2021/01/03/us/politics/indian-health-service-hospital.html.  The patient had to be driven 45 minutes to a hospital in Grants, New Mexico and an additional hour to a hospital in Albuquerque, New Mexico after the hospital in Grants misdiagnosed him.  *Id.*  The inability of the ACL hospital to treat this individual resulted in nearly two hours of driving to find appropriate care for two broken legs.  *Id.*

30.     Multiple times, on a daily basis, Acoma and other community members, who formerly had a short drive to the ACL hospital, now must drive an hour to Albuquerque to receive adequate care, even if they are experiencing severe symptoms of one sort or another.  Lewis Aff. Ex. E, ¶ 9.

31.     The IHS has funds available to keep the ACL hospital open during the pandemic and the one-year notice period.  Ex. G.  Specifically, the IHS has its regular annual appropriations, as well Area and Headquarters funds including the Director's emergency fund at its disposal and has not explained why those funds could not be used.  Ex. G.

32.     In addition, in 2020 Congress provided the IHS with billions in supplemental funding to prepare for, prevent and respond to the coronavirus pandemic.  In the Coronavirus Aid, Relief, and Economic Security Act (CARES Act), Pub. L. No. 116–136, Congress set aside $1.032 billion for the IHS and tribally operated facilities, as well as $175 billion in a Provider Relief Fund for health care providers generally.   HHS designated a minimum of $500 million of that $175 billion for IHS and tribal facilities, while also allowing IHS and tribal facilities the access to the remainder of the Provider Relief Funds on the same basis as other health care providers.  U.S. Dep't of Health & Human Servs., CARES Act Provider Relief Fund: General Information,

https://www.hhs.gov/coronavirus/cares-act-provider-relief-fund/general-information/index.html, (last visited Jan. 27, 2021).  While some of the these funds were specifically designated by Congress or allocated by the IHS for tribally operated facilities, the IHS retained hundreds of millions of dollars from these two sources of funding for direct service facilities like ACL Hospital.  In Dear Tribal Leader letters sent on April 3 and April 23, 2020 the IHS explained that $570 million in CARES Act funds were being used to support direct service and tribally operated facilities.  Exs. H & I.  In its April 23, 2020 Dear Tribal Leader letter, the IHS explained that it was reserving $30 million "to address unanticipated needs in the near future."  Ex. I.

33.     In late December, Congress made an additional $790 million in funding for the IHS in the Coronavirus Response and Relief Supplemental Appropriations Act, (Pub. L. No. 116-260).  As described in a January 15, 2021 Dear Tribal Leader Letter, those funds are to be used "to support COVID-19 testing, contact tracing, *containment, mitigation and related activities for monitoring and suppressing* COVID-19 in American Indian and Alaska Native (AIAN) communities." ).  Ex. J.  The letter outlines the following distribution:

- $550 million: to IHS Federal health programs and THPs, using existing distribution methodologies for program increases in Hospitals and Health Clinics, Purchased/Referred Care, Alcohol and Substance Abuse, Mental Health, Community Health Representatives, and Public Health Nursing;

- $50 million: Urban Indian Organizations;

- $190 million to purchase COVID-19 tests, test kits, testing supplies, therapeutics, and related personal protective equipment through the IHS National Supply Service Center.

Ex. J.

## CAUSES OF ACTION

**Count I — Violation of the Administrative Procedure Act, 5 U.S.C. §§ 701-706**

34. The Tribe incorporates by reference paragraphs 1 through 33 as if set forth fully herein.

35. The IHS's discretion to close a hospital has been constrained by Congress. Under Section 301(b) of the IHCIA, the IHS may not close any Service hospital, or portion thereof, without first providing Congress a detailed evaluation and one year's notice. That section provides in relevant part:

> (1) Notwithstanding any provision of law other than this subsection, no Service hospital or outpatient health care facility of the Service, or any portion of such a hospital or facility, may be closed if the Secretary has not submitted to the Congress at least 1 year prior to the date such hospital or facility (or portion thereof) is proposed to be closed an evaluation of the impact of such proposed closure which specifies, in addition to other considerations—
>
> (A) the accessibility of alternative health care resources for the population served by such hospital or facility;
> (B) the cost effectiveness of such closure;
> (C) the quality of health care to be provided to the population served by such hospital or facility after such closure;
> (D) the availability of contract health care funds to maintain existing levels of service;
> (E) the views of the Indian tribes served by such hospital or facility concerning such closure;
> (F) the level of utilization of such hospital or facility by all eligible Indians; and
> (G) the distance between such hospital or facility and the nearest operating Service hospital.

25 U.S.C. § 1631(b)(1).

36. The IHS is authorized to temporarily close a Service hospital, but only if the closure is necessary for "medical, environmental, or safety reasons." 25 U.S.C. § 1631(b)(1).

37. The IHS has not provided Congress with the requisite evaluation or one year notice it is required to provide before a closure beginning on February 1, 2021. Instead, the IHS has attempted to characterize the pending closure as a temporary closure required for patient safety.

The safety issue has been caused, according to the IHS, by the fact that the IHS no longer has funds available to the ACL Service Unit to fund the ACL Hospital indefinitely.  The IHS has funds available to keep the ACL Hospital open during the pandemic and the one year notice period but has failed to use those funds to keep the ACL Hospital open.  The IHS cannot create a self-inflicted safety issue by withholding funds from the ACL Hospital in order to circumvent its obligation to provide the required evaluation and one year notice to Congress.

38. The IHS's threatened closure of ACL Hospital is precisely what Congress intended to address through the one year notice and evaluation requirement in Section 301(b) of the IHCIA.  That process is designed to ensure that if the IHS does elect to close a hospital, or a portion thereof, that its patients will still be able to receive quality hospital care by non-IHS hospitals in the area after the closure.  The IHS has utterly failed to conduct that analysis in this case.  The IHS's failure to comply with Section 301(b) is reviewable and enforceable under the Administrative Procedure Act, 5 U.S.C. § 702.

**Count II — Violation of the Indian Self-Determination and Education Assistance Act**

39. The Tribe incorporates by reference paragraphs 1 through 38 as if set forth fully herein.

40. Section 105(i) of the ISDEAA, 25 U.S.C. 5324(i), requires the Secretary to ensure that any division of a program serving one or more tribes must be conducted in consultation with all affected tribes, and may not limit or reduce the funding for any Tribe served by the program.  It provides, in relevant part:

> (1) If a self-determination contract requires the Secretary to divide the administration of a program that has previously been administered for the benefit of a greater number of tribes than are represented by the tribal organization that is a party to the contract, the Secretary shall take such action as may be necessary to ensure that services are provided to the tribes not served by a self-determination contract, including program redesign in consultation with the tribal organization and all affected tribes.
>
> (2) Nothing in this subchapter shall be construed to limit or reduce in any way the funding for any program, project, or activity serving a tribe under this or other

applicable Federal law. Any tribe or tribal organization that alleges that a self-determination contract is in violation of this section may apply the provisions of section 5331 of this title.

25 U.S.C. 5324(i).

41. The IHS failed to redesign the program in consultation with the Tribe in a manner that ensured services would continue to be provided to the Tribe, and the IHS failed to ensure that funding for the program serving the Tribe, ACL Hospital, would not be "limit[ed] or reduce[d] in any way." As a result, the IHS has violated Section 105(i) of the ISDEAA, 25 U.S.C. 5324(i). which is an action reviewable by this Court under Section 110 of the ISDEAA. 25 U.S.C. 5324(i)(2).

PRAYER FOR RELIEF

**Wherefore, Plaintiff prays for relief as follows:**

A.   An Order compelling Defendants to maintain the current levels of service at the ACL Hospital until such time as the IHS complies with Section 301(b) of the IHCIA and Section 105(i) of ISDEAA.

B.   A declaration that the IHS's decision to close the ACL Hospital and operate it instead as an urgent care clinic with limited hours and services violates Section 301(b) of the IHCIA and Section 105(i) of ISDEAA.

C.   Such temporary and injunctive relief as is necessary to preserve hospital services at ACL Hospital pending resolution of this litigation.

D.   Any further relief to which the Tribe may be entitled or which the Court may deem appropriate after full development of the facts.

Respectfully submitted,

/s/ Elliott Milhollin
Elliott A. Milhollin (DC Bar No. 474322)

                    Caroline P. Mayhew (DC Bar No. 1011766)
                    Gregory A. Smith (DC Bar No. 413071)
                    Hobbs, Straus, Dean & Walker, LLP
                    1899 L Street NW, Suite 1200
                    Washington, DC 20036
                    202-822-8282 (Tel.)
                    202-296-8834 (Fax)

                    Attorneys for the Pueblo of Acoma

DATED: January 28, 2021